IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ERES, N.V.,                        §
                                   §
      Plaintiff,                   §
                                   §
v.                                 §        CIVIL ACTION NO. H-09-879
                                   §
CITGO ASPHALT REFINING, *et al.*,  §
                                   §
      Defendants.                  §


Consolidated with


CITGO PETROLEUM CORP., *et al.*,   §
                                   §
      Plaintiff,                   §
                                   §
v.                                 §        CIVIL ACTION NO. H-08-3627
                                   §
NUSTAR ASPHALT REFINING, LLC,      §
*et al.*,                          §
                                   §
      Defendants.                  §


MEMORANDUM AND ORDER


     Pending are Plaintiff Eres's Motion to Compel Defendants to

Arbitrate the Claims Under the COA and Memorandum of Law in Support

of Motion (Document No. 84), the Nustar Parties' Consolidated

Motion for Summary Judgment and Brief in Support (Document No. 88),

and Defendants/Cross-Plaintiffs Citgo Petroleum Corporation's and

Citgo Asphalt Refining Company's Motion for Partial Summary

Judgment (Document No. 98).   After carefully considering the

motions, responses, and the applicable law, the Court concludes as follows.[1]

## I.  Background

This commercial dispute centers on whether a contract of affreightment was assigned and assumed as part of the sale of substantially all of a corporation's assets.  Pursuant to a November 2004 Tanker Voyage Charter Party (also the "Contract of Affreightment" or "COA"), Citgo Asphalt Refining Co. ("CARCO"), a subsidiary of Citgo Petroleum Corporation ("Citgo," and together, the "Citgo Parties"), was to utilize vessels from Eres, N.V. ("Eres") for a period of seven years, beginning January 1, 2005, for shipment from Venezuela of at least three million barrels of asphalt annually.[2]  Citgo guaranteed CARCO's performance under the COA.[3]  Both parties performed under the contract without incident for three years.

---

[1] The Court GRANTS The NuStar Parties' Request for Judicial Notice (Document No. 100), to which no opposition has been filed, and takes judicial notice of the website of CITGO Petroleum Corp. establishing that it is owned by PDV America, Inc., an indirect, wholly owned subsidiary of Petroleos de Venezuela, S.A., the national oil company of the Bolivarian Republic of Venezuela.

[2] Eres ex. 92(1) at 2-3 (hereinafter "COA").  Due to the spread of each party's voluminous summary judgment exhibits over multiple docket entries, each exhibit is referred to by its submitting party and number.

[3] Eres ex. 92(2) at 1.

In 2007, CARCO contracted to sell all of its assets--including the COA--to NuStar Asphalt Refining, LLC ("NuStar Asphalt").  CARCO and NuStar Asphalt executed a Sale and Purchase Agreement (the "SPA") on November 5, 2007, and closed the deal in March 2008, after twice amending the SPA.[4]  Although the terms of the COA did not require Eres's consent for assignment,[5] CARCO on November 21, 2007, sought Eres's "consent to assign the [COA] to [NuStar Asphalt] as part of the sale and purchase transaction."[6]  CARCO's consent letter to Eres stated that "[u]pon assignment, [NuStar Asphalt] will succeed to all of CARCO's liabilities and obligations under the [COA]."[7]  Eres responded that it would sign the consent letter if NuStar Energy LP ("NuStar Energy"), NuStar Asphalt's parent company, guaranteed NuStar Asphalt's performance under the COA.[8]  NuStar Energy prepared a draft parent guaranty (the "NuStar Energy Guaranty"), which it sent to Eres on December 27, 2007.[9]  Shortly thereafter, it was determined that NuStar Marketing, LLC ("NuStar Marketing") was actually the entity intended to take over the COA; CARCO sent a new consent letter, and NuStar Energy

---

[4] *See* Eres exs. 3-4.

[5] *See* Eres ex. 92(1) (hereinafter "COA").

[6] Citgo ex. 5 at ERES 00020.

[7] Id.

[8] Citgo ex. 6 at NUSTAR 006510.

[9] Eres exs. 45, 78.

3

adjusted the draft guaranty to guarantee NuStar Marketing's performance.[10]  The parties exchanged a series of emails altering the guaranty's language through early February 2008,[11] but never actually signed and delivered a guaranty or a signed consent. After a further series of emails regarding "finaliz[ing] the paperwork" and coordinating schedules, Eres and NuStar Energy ultimately agreed to meet on April 22, 2008 to sign and exchange the consent (by Eres) and guaranty (by NuStar Energy).[12]  Those documents were never signed and exchanged.

In the meantime, on March 20, 2008, NuStar Asphalt and CARCO closed on the SPA.[13]  The same day, CARCO and NuStar Asphalt, and NuStar Marketing (NuStar Asphalt and NuStar Marketing are hereinafter referred to collectively as the "NuStar Parties")[14] entered into an Assignment and Assumption Agreement (the "Assignment Agreement"), which was "made subject to the terms and

---

[10] NuStar ex. 21 at 1; NuStar ex. 23 at 3.  NuStar Asphalt and NuStar Marketing previously requested that CARCO assign its transportation contracts to NuStar Marketing and its operational contracts to NuStar Asphalt.  *See* Citgo ex. labeled "Deposition Excerpt Mike Hoeltzel" at 39 (hereinafter "Hoeltzel Depo.").

[11] Eres exs. 15, 47, 48, 69, 78, 81, 83, 92, 94.

[12] Eres ex. 85; *see also* Eres exs. 17-19, 24, 29; NuStar exs. 32, 42.

[13] Document No. 88 at 15; Eres exs. 4, 11.

[14] The NuStar Parties does *not* include the parent company NuStar Energy, which has not been joined in this action.

4

conditions contained in the Purchase Agreement."[15]  Under this agreement, CARCO agreed, as of the closing date, to "assign[], convey[], and transfer[] unto NuStar Marketing, all right, title and interest" in a series of contracts attached to the Assignment Agreement as Exhibit A, which includes the COA.[16]  NuStar Marketing "assume[d] and agree[d] to pay, perform, observe and discharge, fully and timely, all of [CARCO's] guarantees, undertakings, promises, rights, covenants and obligations under" the same contracts.[17]  Also on March 20, 2008, NuStar Asphalt guaranteed NuStar Marketing's performance of the agreements it assumed under the Assignment Agreement.[18]

Neither the Citgo Parties nor the NuStar Parties have performed under the COA since the closing, and Eres considers the COA repudiated as of August 2008.[19]  Eres asserts it has sustained damages of approximately $121 million.[20]  The NuStar Parties assert that CARCO never actually assigned the COA to NuStar Marketing, and that none of the NuStar Parties assumed the COA; therefore, they seek a declaratory judgment that none of the NuStar Parties has any

---

[15] Eres ex. 11 at 1 (hereinafter "Assignment Agreement").

[16] Id. at 1, 6.

[17] Id. at 1-2.

[18] Eres ex. 13.

[19] Citgo ex. 21 at NUSTAR 006655.

[20] Document No. 71 at 10.

obligations to Eres under the COA, SPA, Assignment Agreement or NuStar Asphalt's Guaranty.[21]

The Citgo Parties, on the other hand, assert that the COA was not only assigned and assumed, but also that Eres consented to CARCO's release from the COA.   They request partial summary judgment: (1) that NuStar Asphalt is in breach of the SPA for failure to defend and indemnify; (2) that NuStar Marketing breached the Assignment Agreement by failing to perform its obligations under the COA; and (3) that NuStar Asphalt breached its guaranty of NuStar Marketing's performance of the COA.   The Citgo Parties also seek declaratory judgment: (1) that assignment of the COA under the SPA and Assignment Agreement was proper; (2) that NuStar Asphalt owes the Citgo Parties a duty to defend against, and indemnity for damages arising out of, Eres's claims on the COA; and (3) that Eres consented to its release from the COA, and thus the Citgo Parties are not bound to arbitrate.[22]

Eres asks the Court to retain jurisdiction over the case and compel arbitration with both parties under the COA, asserting that

---

[21] Document No. 73 at 20.

[22] *See* Document No. 72 at 19-24 (Citgo Parties' Answer and Crossclaim); Document No. 98 at 31 (Motion for Partial Summary Judgment).

the NuStar Parties are bound by assumption and that it never consented to a novation releasing CARCO from the COA.[23]

## II. Summary Judgment Standard

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive

---

[23] Document No. 71 at 12 (Amended Complaint); Document No. 84 at 34 (Motion to Compel Defendants to Arbitrate).

evidentiary burden." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." <u>Id.</u> Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

## III.   <u>Motion to Compel Arbitration</u>

### A.   <u>Agreement to Arbitrate</u>

Eres moves to compel arbitration under the COA, which provides, "Any and all disputes arising out of or relating to this Contract of whatsoever nature shall be arbitrated in the City of New York . . . ."[24] The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), implemented at 9 U.S.C. §§ 201-208, governs enforcement of the

---

[24] COA at 13.

COA's arbitration clause.  *See* 9 U.S.C. §§ 2, 202 (arbitration agreements, including those in maritime contracts, subject to Convention).  The Convention further incorporates the provisions of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, to the extent such provisions are "not in conflict" with the Convention.  Id. § 208.  Whether the Convention requires compelling arbitration is a "limited inquiry" that should be answered in the affirmative if four conditions are fulfilled: (1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen.  Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 339 (5th Cir. 2004).  Only if the court "finds that the said agreement is null and void, inoperative or incapable of being performed" should it not compel arbitration upon fulfillment of these conditions.  Id. (quoting Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1146 (5th Cir. 1985)).

The sole dispute on compelling arbitration is whether the NuStar Parties, the Citgo Parties, or both, are bound to the COA's arbitration provision.[25]  "In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract

---

[25] Eres is a foreign business entity organized under the laws of Belgium.  Document No. 71 at 2.

containing an arbitration clause." Bridas S.A.P.I.C. v. Gov't of
Turkmenistan, 345 F.3d 347, 353 (5th Cir. 2003) (citations
omitted). CARCO and Citgo, as the original signatory and guarantor
to the COA, respectively, are bound to arbitrate unless there was
a *novation* of the COA by which NuStar Asphalt and/or NuStar
Marketing were *substituted* for CARCO. The NuStar Parties are
similarly bound if they assumed the COA. *See* Bridas, 345 F.3d at
356 (including assumption among the theories recognized for binding
a nonsignatory to an arbitration agreement). Thus, determination
of the proper parties to arbitration under the COA necessarily
depends upon: (1) interpretation of the SPA to determine whether
any or all of the NuStar Parties assumed the COA, and (2) upon
whether the parties consented to a novation of the COA, and if so,
which parties remain bound by the COA.

B.    Assignment and Assumption of the COA in the Asset Sale

      The COA, which is governed by United States maritime law (and
by New York law when the maritime law "has not addressed a
particular issue")[26] does not itself require Eres's consent to be
assigned or assumed by another party. Under general principles of
contract law, which are often used to interpret maritime contracts,
a party to the COA was thus able freely to assign its rights in the
contract and a third party concomitantly could assume the duties of

---

[26] COA at 14.

a party to the contract, without Eres's consent.  *See* <u>Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc.</u>, 791 F.2d 1227, 1234 (5th Cir. 1986) (applying "general rules of contract law" to maritime contract); RESTATEMENT (SECOND) OF CONTRACTS §§ 317-18 (general contract law permits free assignment of rights and assumption of duties unless otherwise agreed, contrary to public policy, or involving personal services or the "exercise of personal skill or discretion").  The same result is reached under New York law. *See* <u>Pravin Banker Assocs. v. Banco Popular Del Peru</u>, 109 F.3d 850, 856 (2d Cir. 1997) ("Under New York law, only *express* limitations on assignability are enforceable." (emphasis in original)).

The NuStar Parties, however, contend that the SPA independently requires that Eres's consent be obtained as a pre-condition to CARCO's assignment and/or the NuStar Parties' assumption of the COA.

## 1.   <u>Legal Standards</u>

The SPA states that it "shall be construed (both as to validity and performance), interpreted and enforced in accordance with, and governed by, the Laws of the State of Texas, without

regard to the conflict of laws principles of Texas."[27]   The Assignment Agreement incorporates the SPA by reference.[28]

Texas courts construe contracts to give effect to "the true intentions of the parties as expressed in the instrument." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). Contract terms are given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp., 294 S.W.3d 164, 168 (Tex. 2009). Courts interpret multiple documents relating to a single transaction together, see Fort Worth Indep. Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000), and ensure that all provisions are given effect, and none rendered meaningless. Cedyco Corp. v. PetroQuest Energy, LLC, 497 F.3d 485, 490 (5th Cir. 2007).   If the contract is subject to two or more reasonable interpretations, it is ambiguous, which creates a fact issue on the parties' intent. Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).   However, a contract term is not ambiguous merely because the parties offer conflicting interpretations. Id. "Determining whether a contract is unambiguous and interpreting an unambiguous contract are questions of law." Cedyco, 497 F.3d at 490 (citing Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)).   The SPA and

---

[27] Eres ex. 2 § 10.9 (hereinafter "SPA").

[28] Eres ex. 11 at 1.

12

Assignment Agreement are unambiguous and are therefore subject to being construed as a matter of law.[29]

While assignment of a contract transfers the assignor's rights to the assignee, the assignee is not bound to perform the obligations of the contract unless the assignee expressly or impliedly assumes them.  Jones v. Cooper Indus., Inc., 938 S.W.2d 118, 124 (Tex. App.--Houston [14th Dist.] 1996, writ denied).

2.   Assignment and Assumption of the COA

The SPA includes a number of schedules incorporated as part of the Agreement itself.  Among the schedules are the following:

    Schedule 3.8(a), Seller Disclosure Schedule of Material
    Contracts;

    Schedule 3.22, Seller Disclosure Schedule of Assumed
    Contracts;

    Schedule 2.4(a), Seller Third-Party Consents and
    Authorizations, listing contracts;

    Schedule 8.3(g), Necessary Third-Party Consents and
    Authorizations, listing contracts.

Schedule 3.8(a) contained CARCO's disclosure to NuStar Asphalt of all material contracts to which CARCO was a party pertinent to

_____

[29] The parties submit extensive evidence regarding the negotiations and drafting of the SPA and Assignment Agreement, but "[a]n unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."  David J. Sacks, P.C. v. Haden, 266 S.W.3d 447, 450 (Tex. 2008).

the transaction contemplated by the SPA.  The COA was listed as one of those contracts.

Schedule 3.22 of the SPA listed all "Assumed Contracts," and the COA was on the list.  The term "Assumed Contracts" was defined in Section 2.4(a)(i), as follows:

> [NuStar Asphalt] shall assume and agree to pay, perform and discharge, and indemnify, defend and hold [CARCO], the Partners and their Affiliates harmless from . . . all Obligations of [CARCO] under (x) all Contracts to which [CARCO] is a party as of [closing] to the extent relating to the Business or the Transferred Assets (collectively, the "Assumed Contracts") . . . .

CARCO was a party to the COA at the time of Closing (March 20, 2008), and the COA, being a contract pertaining to the shipment of asphalt, did relate to CARCO's asphalt refining business and its sale of those assets.  Thus, NuStar Asphalt bound itself expressly to assume CARCO's obligations under the COA.  Accordingly, at Closing on March 20, 2008, CARCO, NuStar Asphalt, and NuStar Marketing executed an Assignment and Assumption Agreement, in which CARCO at paragraph 1.(ii) expressly assigned, conveyed, and transferred to NuStar Marketing,

> all right, title and interest in the Assumed Obligations under the NuStar Marketing Assumed Contracts, and NuStar Marketing hereby assumes and agrees to pay, perform, observe and discharge, fully and timely, all of Assignor's guarantees, undertakings, promises, rights, covenants and obligations under such Assumed Obligations.

14

Also at Closing, NuStar Asphalt executed and delivered to CARCO a separate Guaranty Agreement, in which NuStar Asphalt:

> unconditionally guarantee[d] . . . to [CARCO], its successors and assigns the due performance of all obligations, and the prompt payment in full of all amounts, which are now or may hereafter become due and owing when due, by NuStar Marketing . . . pursuant to the terms of the Agreements.

The "Agreements," on Exhibit A to the Guaranty, listed *only* the COA.  It was therefore a singular document specifically delivered to CARCO at closing by NuStar Asphalt in which NuStar Asphalt expressly guaranteed NuStar Marketing's performance of all of CARCO's obligations under the COA.  The Guaranty itself is unqualified, without reservation or condition.  On the face of these documents, NuStar Marketing and NuStar Asphalt plainly assumed performance of CARCO's obligations under the COA, and therefore they are both bound by its arbitration clause.

NuStar points out, however, that the Assignment and Assumption Agreement delivered to CARCO at Closing was by its own terms "made subject to the terms and conditions contained in the [SPA]." Turning to the SPA, NuStar argues that "a condition precedent on the assignment of contracts such as the COA [was a] required third-party consent."  Because Eres never consented to CARCO's assignment of the COA to NuStar, Nustar argues, the COA was not an "Assumed Contract" assigned and transferred to NuStar by the Assignment and Assumption Agreement.  This argument requires a further examination

of the terms of the SPA, and its references to third-party consents.

Schedule 2.4(a), entitled "Seller-Third Party Consents and Authorizations," lists a large number of contracts, including the COA.  Schedule 8.3(g), entitled "*Necessary* Third-Party Consents and Authorizations" (emphasis added), is a subset of the contracts listed on Schedule 2.4(a).  After the Second Amendment to the SPA was agreed, and at the time of Closing, the COA was *not* listed on Schedule 8.3(g), but remained listed on Schedule 2.4(a).

Article VIII of the SPA, entitled "Closing Conditions," expressly sets forth the conditions precedent to the Closing of the transaction, all of which are waivable by the party for whose benefit the Closing condition exists.  Under Section 8.3, entitled "Additional Conditions to Buyer's Obligations," it is provided that the Buyer's (NuStar Asphalt's) obligation to close "shall be subject to the satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived by Buyer, in whole or in part, to the extent permitted by applicable law:

* * *

(g)   All third party consents and authorizations listed on Schedule 8.3(g) shall have been obtained in a form reasonably satisfactory to Buyer and, to the extent relating to Real Property, recordable in the applicable real property records.

As observed above, Schedule 8.3(g) was amended prior to Closing so as to delete the COA, and therefore, the COA was not listed as a contract to which a third-party consent from CARCO was *required* as an expressed precondition to NuStar Asphalt closing its obligations to effect the transactions contemplated by the SPA.

In contrast, Article V of the SPA sets out the Pre-Closing Covenants of the parties. In Section 5.2(b) thereof specific reference is made to Schedule 2.4(a), which helps to explain the purpose of that list:

> Seller and Buyer shall each timely give or cause to be given all notices to third Persons and use commercially reasonable efforts to obtain all Third-Party Consents and Authorizations (i) set forth on Schedule 2.4(a) and Schedule 2.4(b), as applicable, or (ii) required under any Assumed Contract in connection with the consummation of the transactions contemplated hereby.

Moreover, Section 2.4 of the SPA, entitled "Deliveries at the Closing," states that Seller shall deliver, or cause to be delivered, to Buyer at the Closing, a number of items, including,

> (v)   a copy of each Third-Party Consent and Authorization set forth on Schedule 2.4(a) for which consent has been obtained;

> (vi) a copy of each Third-Party Consent and Authorization set forth on Schedule 8.3(g).

Again, the difference between the two Schedules is manifest, with CARCO being obligated to deliver to NuStar Third-Party Consents for each of the Contracts listed on Schedule 8.3(g), the "*Required*"

Consents, but being obligated to deliver to NuStar only those Third-Party Consents that "[have] been obtained" for the contracts listed on Schedule 2.4(a).

The COA itself did not require by its terms the consent of Eres in order for CARCO to assign it and for Nustar to assume its obligations.  Likewise, no language in the SPA expressly required Eres's consent as a pre-condition to CARCO's assignment of the COA to NuStar.  What was required, however, was for both CARCO and NuStar to "use commercially reasonable efforts to obtain Third-Party Consents and Authorizations (i) set forth on Schedule 2.4(a) . . . ."  In light of the foregoing, it makes sense that Schedule 2.4(a)(v) provides for delivery at closing of the Third-Party Consents "set forth on Schedule 2.4(a) *for which consent has been obtained*."  (Emphasis added.)  This in no way alters NuStar Asphalt's obligation under Section 2.4(a)(i) to assume all of the "Assumed Contracts."

The NuStar Parties argue, however, that the second sentence in Section 7.5 of the SPA, when read together with Schedule 2.4(a), required a post-closing consent from Eres as a precondition to the NuStar Parties' assumption of the COA.  Section 7.5 is a part of Article VII of the SPA, entitled "Post-Closing Covenants."  Among other items, it deals with insurance, prorations, deposits and taxes, access to records, etc.  It is in this context that Section 7.5 is included, as follows:

18

Section 7.5  <u>Third-Party Consents or Authorizations Not Obtained as of Closing</u>.  Subject to and without limiting the provisions of <u>Section 8.3(g)</u>, this Agreement shall not constitute an agreement to assign or assume any Contract or Authorization if an attempted assignment thereof, without a required Third-Party Consent or Authorization that has not been obtained as of the Closing, would constitute a breach or other contravention of the rights of such third party, would be ineffective with respect to any party to an agreement concerning such Contract or Authorization, or would violate or otherwise is not permitted by applicable Law.  *If any transfer or assignment by Seller to, or any assumption by Buyer of, any interest in, or Assumed Obligations under, any Contract or Authorization requires any Third-Party Consent or Authorization, then no such assignment or assumption shall be made without such Third-Party Consent or Authorization being obtained.*  Notwithstanding the foregoing, upon the receipt of any such Third-Party Consent or Authorization after the Effective Time, any such Contract or Authorization shall be assigned to Buyer and Buyer shall assume same as and to the extent provided herein.

(a)  If any such Third-Party Consent or Authorization is not obtained prior to the Closing Date, then: (i) after Closing, Seller and Buyer shall cooperate to procure the transfer of any Contracts or Authorizations not transferred to Buyer at Closing (including cooperating in obtaining required Third-Party Consents or Authorizations and sharing equally the economic cost required to obtain the pertinent consent, provided that to the extent any costs or obligations required by third parties to obtain such Third Party Consents or Authorizations are attributable to the acts or omissions of Seller or any of its Affiliates prior to the Closing (other than as a result of the act of soliciting such Third Party Consent or Authorization), Seller shall solely pay or satisfy such costs or obligations, as the case may be)), (ii) Seller and Buyer shall cooperate (each at its own expense) in any lawful and reasonable arrangement reasonably proposed by Buyer or Seller under which Buyer shall obtain to the extent practicable the economic Claims, rights and benefits under the Contract or Authorization with respect to which the Third-Party Consent or Authorization has not been obtained in accordance with this Agreement, and (iii) Seller shall indemnify Buyer to the extent Buyer is unable to conduct

19

the Business in all material respects in the manner in
which it was conducted immediately prior to the Closing
Date.

(Emphasis added to second sentence.)

The NuStar Parties assert that the second sentence of the
first paragraph implicitly refers to Schedule 2.4(a), where the COA
is listed.   They contend that the *SPA* requires a third party
consent (as distinguished from such a requirement being made in the
contract that is to be assigned/assumed) and therefore that the
assignments/assumptions of the contracts on Schedule 2.4(a) cannot
be made without obtaining Third-Party Consents.  As applied to the
COA, therefore, the NuStar Parties assert that Section 7.5, read in
conjunction with the definition of "Third-Party Consent" in Section
1.1, creates an additional condition precedent to assignment and
assumption of the COA: namely, that Eres must consent to the
assignment and assumption regardless of the fact that there is no
such requirement in the COA itself, and regardless of the fact that
the COA was not listed as a "Necessary Third Party Consent" on
Schedule 8.3(g).

"Texas does not generally favor reading conditions precedent
into contracts . . . ."  <u>Cedyco Corp. v. PetroQuest Energy, LLC</u>,
497 F.3d 485, 488 (5th Cir. 2007) (citing <u>Sirtex Oil Indus. v.
Erigan</u>, 403 S.W.2d 784, 787 (Tex. 1966)).  Section 7.5 expressly
lists the conditions to which the parties intended to subject
assignment and assumption, all of which are tied to the actual

requirements of the underlying contracts or their applicable law. It does not *mention* Schedule 2.4(a) (although it expressly *is* made subject to Schedule 8.3(g)).  Implying this unstated but important *additional* condition on assignment and assumption without any clear reference is not warranted from a plain reading of Section 7.5, especially given the fact that the SPA is a highly detailed and specific 67-page contract, with numerous additional schedules, to effect a $450 million complex transaction.

Read as a whole, Section 7.5 deals with third party consents that are not obtained before closing, but without limiting NuStar Asphalt's right to receive the *required* third-party consents on Schedule 8.3(g).  Essentially, the parties disavow any intent to assign or assume a contract without a third party consent if such would under the terms of that contract vitiate the contract, render it ineffective, or violate applicable law, and in the second sentence they agree to make no assignment or assumption of any interest in any contract that "requires" third-party consent or authorization.  They agree post-closing to cooperate to obtain consents not obtained before closing, to share the costs of doing so, and to assign to NuStar Asphalt the consents that are received post-closing.  Moreover, where consents required by the contracts cannot be obtained, the parties agree to cooperate to obtain "to the extent practicable the economic Claims, rights and benefits under the Contract or Authorization" with respect to which the

third party consent or authorization has not been obtained, and
finally, CARCO agrees to indemnify NuStar Asphalt to the extent
that NuStar Asphalt "is unable to conduct the Business in all
material respects in the manner in which it was conducted"
immediately before closing.  In short, Section 7.5 cannot fairly be
read to imply that the assignment/assumption of the COA, which
required no consent by Eres, should nonetheless be understood to
require Eres's consent by reason of Schedule 2.4(a) and, therefore,
to conclude that the COA was not assigned by CARCO and assumed by
the NuStar Parties.  Accordingly, the NuStar Parties effectively
assumed CARCO's obligations under the COA, and they are therefore
bound to its arbitration clause.

## C. <u>Novation</u>

Notwithstanding CARCO's assignment and the NuStar Parties'
assumption of the COA, CARCO remains liable for performance of the
COA unless CARCO (and consequently Citgo, its guarantor) was
"expressly or impliedly released by the other party to the
contract."  <u>Seagull Energy E & P, Inc. v. Eland Energy, Inc.</u>, 207
S.W.3d 342, 347 (Tex. 2006).[30]  Here, before closing, CARCO sent to

---

[30] "Novation is an affirmative defense," <u>Honeycutt v. Billings-</u>
<u>ley</u>, 992 S.W.2d 570, 577 (Tex. App.--Houston [1st Dist.] 1999, pet.
denied), and must therefore be pleaded affirmatively under Federal
Rule of Civil Procedure 8(c).  <i>See</i> <u>Walter E. Heller & Co. v. O/S</u>
<u>Sonny V.</u>, 595 F.2d 968, 976 (5th Cir. 1979) (stating same with
respect to discharge under Texas law) although the NuStar Parties
point out that the Citgo Parties did not plead "novation" in its

Eres a consent form requesting Eres's consent to "assignment" of the COA, which stated that "[u]pon assignment, [NuStar Asphalt] will succeed to all of CARCO's liabilities and obligations under the [COA]."[31]  While it is undisputed that Eres never signed this or any other consent for a third-party to succeed to all of CARCO's liabilities, a signed writing is generally not required for enforcement of a novation agreement; it may be inferred "from the acts and conduct of the parties and other facts and circumstances." Chastain v. Cooper & Reed, 257 S.W.2d 422, 424 (Tex. 1953).[32]  As the parties asserting novation, the Citgo Parties bear the burden to prove: (1) a valid, existing contract; (2) an agreement among all the parties to accept a new contract; (3) the extinguishment of the old contract; and (4) the validity of the novation agreement. CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship, 164 S.W.3d 675, 681

---

affirmative defenses, Document No. 103 at 17 n.12, the Citgo Parties *do* assert, as an affirmative defense, that "CITGO and Eres are not parties to any arbitration agreement."  Document No. 72 at 12.  Moreover, Eres, the party against whom the defense is directed, has responded on the merits to the Citgo Parties' novation claim rather than asserting waiver of the defense. *See* Document No. 102 at 29-31.  Under Rule 8's liberal pleading and construction standards, the issue of novation of the COA has been raised and joined.

[31] Citgo ex. 5 at ERES 00020.

[32] The COA provides that any "changes or modifications to this Contract must be mutually agreed in writing."  COA at 15.  Neither Eres nor the Citgo Parties discuss whether this clause was effective to proscribe a novation without a signed writing, but the proviso would seem at least to reinforce the conclusion that there was not a novation.

23

(Tex. App.--Austin 2005, no pet.) (citing <u>Vickery v. Vickery</u>, 999 S.W.2d 342, 356 (Tex. 1999)).  "A new agreement can establish novation as a matter of law when the state of the evidence is such that reasonable minds cannot differ as to its effect." <u>Id.</u> (citing <u>Chastain</u>, 257 S.W.2d at 424).

Eres would not consent to releasing the Citgo parties without receiving a guaranty from the NuStar Parties' parent company, NuStar Energy.[33]  Thus, for the Citgo Parties to show that Eres released CARCO, they must demonstrate that Eres and NuStar Energy agreed to NuStar Energy's guaranty of NuStar Asphalt's performance of the COA, and that Eres was satisfied that this agreement met its condition so as to make its consent effective.  There is no signed contract in the summary judgment evidence containing such a guaranty agreement from NuStar Energy.  The uncontroverted summary judgment evidence is that Eres and NuStar Energy or its affiliates exchanged drafts of a written guaranty, revised each other's drafts, exchanged emails regarding negotiations on the guaranty, and that both parties contemplated that a final guaranty agreement would require the signature of an authorized officer of NuStar Energy.[34]  Thus, the question is whether the NuStar Energy Guaranty "was accepted and became a binding contract without the signatures

---

[33] NuStar ex. 17 at 2.

[34] *See* NuStar exs. 18, 19, 21, 22, 24, 25, 28, 31 (indicating multiple revisions made to the NuStar Energy Guaranty via email).

of the parties." <u>Scaife v. Associated Air Ctr. Inc.</u>, 100 F.3d 406, 410 (5th Cir. 1996). "When reviewing written negotiations, the question of whether an offer was accepted and a contract was formed is primarily a question of law for the court to decide." <u>Id.</u> (quoting <u>S & A Marinas, Inc. v. Leonard Marine Corp.</u>, 875 S.W.2d 766, 769 (Tex. App.--Austin 1994, writ denied)). "Contracts require mutual assent to be enforceable." <u>Baylor Univ. v. Sonnichsen</u>, 221 S.W.3d 632, 635 (Tex. 2007). Where the agreement is reduced to writing, as here, assent to the writing must be manifested; this "commonly consists of signing and delivery." <u>Scaife</u> at 410-11 (quoting <u>Simmons & Simmons Constr. Co. v. Rea</u>, 286 S.W.2d 415, 418 (Tex. 1956)). Regardless of the manner of assent, it must be determined based on an objective view of what the parties actually said and did, without consideration of their subjective intentions. <u>Sadeghi v. Gang</u>, 270 S.W.3d 773, 776 (Tex. App.--Dallas 2008, no pet.).

In <u>Scaife</u>, the Fifth Circuit, applying Texas law, held that a writing intended to govern two parties' agreement required the parties' signatures for formation.

> The contract in this case was revised at least three times and expressly contained signature blocks for the parties. All three of the proposed agreements, entitled "Aircraft Modification Agreement," included the following clause and signature blocks:

```
        IN WITNESS WHEREOF, the parties have caused this
        Agreement to be executed by their duly authorized
        representative at Dallas, Texas, on the date first
        above written.
        SCAIFE FLIGHT OPERATIONS
        By: _____
        Duly Authorized Representative
        Date: _____

                          ASSOCIATED AIR CENTER, INC.
                          By: _____
                                Roy G. Gilbreath
                                     President
                          Date: _____
```

Id. at 411.  The court further noted that deposition testimony

indicated that one party was to sign the agreement then send it to

the other party for its representative's signature.   Id.   "The

contract was never delivered and neither party ever signed the

agreement."   Id.

Here, each of four drafts of the NuStar Energy Guaranty

contained the same signature block:

```
    This Guaranty is executed by Guarantor's duly authorized
    representative as of the date first written above.

        NUSTAR ENERGY L.P.
        By Riverwalk Logistics, L.P., its general partner
           By NuStar GP, LLC, its general partner

        By: _____
            Steven A. Blank
            Senior Vice President, Chief Financial Officer
            and Treasurer[35]
```

---

[35] NuStar ex. 18 at 6; NuStar ex. 19 at 5; NuStar ex. 21 at 8;
NuStar ex. 24 at 3.

Moreover, when NuStar Energy's representative, Tom Russell, sent his first draft of the NuStar Energy Guaranty to Eres, he stated that if it were acceptable to Eres, he would have the guaranty "executed and returned as soon as possible."[36]  Lut Frederickx of Eres, who primarily interacted with Russell on the guaranty and consent, testified in her deposition that after internal approval of the language of the guaranty and consent, she and Russell planned for the parties' representatives to "meet in order to exchange the documents instead of sending them to each other so that we could see and meet the team with whom we intended to have a contract for the next three, four years."[37]  NuStar Energy personnel developed a schedule for hosting a meeting at its offices with representatives from Eres, culminating after lunch "with Legal to finalize contract assignment."[38]

As in Scaife, a signature block for the signature of NuStar Energy's Senior Vice President, Chief Financial Officer and Treasurer was "included on the contract," and the parties "took affirmative steps to ensure" that a signed guaranty would be given in exchange for Eres's signed consent.  *Cf.* 100 F.3d at 411.  "If the parties negotiating a contract intend that the contract shall be reduced to writing and signed by the parties, . . . then either

---

[36] NuStar ex. 18 at 1.

[37] Eres ex. labeled "Frederickx TR." at 141.

[38] NuStar ex. 44 at 1; *see also* NuStar ex. 42 at 1.

party may withdraw at any time before the written agreement is drawn up and signed by both parties." Id. (quoting Gasmark, Ltd. v. Kimball Energy Corp., 868 S.W.2d 925, 929 (Tex. App.--Fort Worth 1994, no writ)).  The uncontroverted summary judgment evidence is that Eres, as a condition for releasing CARCO from its obligations under the COA, required from NuStar Energy a duly executed written guaranty in favor of Eres of NuStar Marketing's assumed obligations under the COA, and that such a duly executed written guaranty was never delivered to Eres, and Eres never released CARCO from the COA.  The Citgo Parties therefore remain bound to the COA, and to its arbitration clause.  Accordingly, all parties will be ordered to arbitration in New York pursuant to the COA, and this action will be stayed pending its completion.  See 9 U.S.C. § 3.

## IV.  Defense and Indemnity

NuStar Asphalt agreed in the SPA to "indemnify, defend and hold [CARCO], the Partners and their Affiliates harmless from" contracts to which CARCO was a party at the time of closing.[39]  This includes the COA, which was validly assigned to and assumed by the NuStar Parties.  Therefore, the Citgo Parties will be entitled to

---

[39] SPA § 2.7(a)(i).  See also SPA § 10.3(a)(i) (stating that NuStar Asphalt agrees to indemnify the Citgo Parties, among others, "from and against any Losses actually suffered or incurred by them, or any of them, arising out of or related to . . . any of the Assumed Obligations," which by Section 2.7(a)(i) includes the Assumed Contracts, which includes the COA as discussed above).

recover from NuStar Asphalt all losses as defined under the term "Loss" in Section 1.1 of the SPA.

## V.   Order

It is therefore

ORDERED  that  Defendants/Cross-Plaintiffs  Citgo  Petroleum Corporation's  and  Citgo  Asphalt  Refining  Company's  Motion  for Partial  Summary  Judgment  is  GRANTED  IN  PART,  and  it  is  DECLARED that the Assignment and Assumption Agreement is a valid and binding assignment  to  and  assumption  by  NuStar  Marketing,  LLC  of  CITGO Asphalt  Refining  Company's  obligations  under  the  Contract  of Affreighment between CARCO and Eres, and that under the SPA, NuStar Asphalt,  LLC  is  obligated  to  defend  and  indemnify  Citgo  Asphalt Refining  Company,  its  Partners  and  their  Affiliates,  for  all  losses as defined under the term "Loss" in Section 1.1 of the SPA; and the Motion  for  Partial  Summary  Judgment  is  otherwise  DENIED.   It  is further

ORDERED  that  the  NuStar  Parties'  Consolidated  Motion  for Summary Judgment (Document No. 88) is DENIED.   It is further

ORDERED that Plaintiff Eres's Motion to Compel Defendants to Arbitrate  the  Claims  Under  the  COA  (Document  No.  84)  is  GRANTED, and it is therefore ORDERED that Citgo Petroleum Corporation, Citgo Asphalt and Refining Company, NuStar Asphalt Refining, LLC, and NuStar Marketing LLC, shall proceed to arbitration with Eres, N.V.

in New York on Plaintiff Eres, N.V.'s breach of contract action, in accordance with the Tanker Voyage Charter Party entered into by Eres, N.V. and Citgo Asphalt Refining Company, and assumed by NuStar Asphalt Refining, LLC and NuStar Marketing, LLC.  In light of this impending arbitration, it is further

ORDERED that all proceedings in this consolidated action are STAYED pending the outcome of the arbitration.  Within thirty (30) days after a final award in arbitration has been rendered in the New York arbitration, any party to this action may move to lift this STAY by filing a motion accompanied by a copy of this Order and evidence that the New York arbitration has been concluded.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this  14th  day of May, 2010.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE